**Bruce BRADFORD, et al., Appellants,**

v.

**Roell VENTO, et al., Appellees.**

**No. 13–97–116–CV.**

Court of Appeals of Texas,
Corpus Christi.

June 24, 1999.

Rehearing Overruled Aug. 12, 1999.

Rex N. Leach, Daniel G. Gurwitz, Atlas & Hall, McAllen, Roger Townsend, Hogan, Dubose & Townsend, Houston, for appellant.

Felipe Garcia, Jr., Law Offices of Ramon Garcia, P.C., Edinburg, Craig S. Smith, Donald B. Edwards, Smith & Edwards, Corpus Christi, for appellee.

## O P I N I O N

Justice YAÑEZ delivered the opinion of the Court, in which Justices HINOJOSA, CHAVEZ, and RODRIGUEZ joined.

Our opinion in this case dated May 6, 1999 was withdrawn by order of this Court on May 27, 1999. We now substitute this opinion in its place.

Appellants Bruce Bradford, Simon Property Group ("Simon"), and Golden Ring Mall Company ("Golden") challenge the legal and factual sufficiency of the evidence in support of a jury verdict in favor of appellees Roell and Debra Vento ("the Ventos"). The jury found (1) Tom Taylor, Bradford, Simon, and Golden liable for civil conspiracy and fraud; (2) Bradford and Taylor liable for tortious interference with prospective contractual relations, intentional infliction of emotional distress, and violations of the Deceptive Trade Practices Act (DTPA); and (3) Taylor liable for breach of fiduciary duty and breach of contract for sale of the business. The judgment awarded appellees $1,274,000[1] in actual damages and $6,500,000[2] in exemplary damages. Taylor did not appeal.

Appellants also challenge the legal and factual sufficiency of the evidence supporting the damages awarded for lost profits, conversion of property, mental anguish, and exemplary damages. Appellants also argue that appellees waived their right to recover on their claim for tortious interference with prospective business relations, and that the judgment improperly permitted appellees to stack damages elements from different theories of recovery rather than requiring them to elect one theory of recovery. Appellees argue one cross point, that the trial court should have awarded damages based on the DTPA. We affirm in part and reverse in part, rendering judgment that the appellants are jointly and severally liable to the appellees for $864,000 in actual damages and $2,520,000 in exemplary damages.

### I.  Facts

Taylor owned a business in Valle Vista Mall in Harlingen, Texas, selling sports cards and other sports memorabilia. Bradford was the manager of the mall, and Simon Property Group and Golden Ring Mall were the owners of the mall. Vento[3]

---

1. We note that the total amount of actual damages awarded in Paragraph A of the trial court's judgment is inconsistent with the amount of damages awarded by the jury in response to questions listed in Paragraph A: Questions 1A, 3A, 8A, 9A, and 11A(c). Because no challenge to the inconsistency was raised on appeal, however, we will not address the issue.

   Paragraph A of the trial court's judgment purports to include the following actual damages awarded by the jury:

   Question 1A, fraud:
   | | |
   |---|---|
   | Reliance damages: | $ 14,000.00 |
   | Mental anguish: | $750,000.00 |

   Question 3A, Taylor's breach of fiduciary duties to Vento:
   | | |
   |---|---|
   | Lost profits: | $100,000.00 |
   | Mental anguish: | $250,000.00 |
   | Loss of personal property: | $ 7,000.00 |

   Question 8A, tortious interference with prospective contractual relations:
   | | |
   |---|---|
   | Lost profits: | $ 20,000.00 |
   | Mental anguish: | $ 10,000.00 |

   Question 9A, civil conspiracy:
   | | |
   |---|---|
   | Lost profits: | $ 75,000.00 |
   | Loss of personal property: | $ 10,000.00 |
   | Mental anguish: | $ 50,000.00 |
   | Expenses: | $ 7,000.00 |

   Question 11A(c), intentional infliction of emotional distress by Bradford:
   | | |
   |---|---|
   | Emotional distress: | $100,000.00 |

2. This figure reflects exemplary damages of $2,500,000 against Bradford, $2,000,000 against Taylor, $1,000,000 against Simon Property Group, and $1,000,000 against Golden Ring Mall Company.

3. References to "Vento" mean Roell Vento. Although his wife, Debra, is a party to the lawsuit and claims to share ownership in the business with her husband, she had little involvement in the events underlying this case.

was a collector of sports memorabilia who became involved with Taylor and the store at Valle Vista Mall.

Vento began collecting sports cards when he was eleven years old. His interest in sports cards and other sports memorabilia grew as he became older, until, as a young man living in the Dallas–Fort Worth area, he devoted much of his free time to going to shops and trade shows to enhance his collection. At this time he decided that he wanted to open a store of his own selling sports collectibles. He and his wife frequently traveled to the Rio Grande Valley to visit family, and Vento would finance these trips by selling items he had collected to collectors in the Valley. In this way he became very familiar with the market for sports collectibles in the Valley.

While Vento was living in Fort Worth he often traded with Taylor and left items on consignment for sale in Taylor's store. Vento's consignment stock at Taylor's store grew to the point where sixty per cent of the stock in Taylor's store actually came from Vento. Vento testified that in May or June of 1994 he and Taylor agreed to be partners in the business. Taylor soon began expressing an interest in getting out of the business altogether, and the two discussed Vento purchasing outright ownership. In August Taylor went on a trip to Seattle and left Vento in charge.

At this point the stories of the parties begin to diverge significantly. Taylor testified that when he returned from Seattle the store was "a mess" and some expensive items were missing. Taylor also testified that Vento had mismanaged the financial accounts of the business and failed to order new stock. He considered having a "fire sale" to put the store back on firm financial ground, and estimated that it would take five to seven thousand dollars to "get all of this taken care of and everything back to normal so that [the store] can operate properly and function through the Christmas season when [he] was going to be selling the store." Vento agreed that he would try to get the money, and soon

after brought Taylor a check for $7000. Taylor used this money to order stock and buy a computer and security system for the business.

Vento testified that the $7000 check was payment for Taylor's half of the business, and produced a contract, dated September 15, 1994 and signed by both parties, describing a sale of Taylor's interest to Vento effective upon payment of $7000. Taylor testified that he never agreed to a sale for $7000, and that his signature on the contract was forged. Over the next couple weeks Taylor continued to go to the store and wait on customers, which "seemed pretty odd" to Vento. Vento initially decided that Taylor may have come to the store to "shoot the breeze and hang out or whatever."

On October 4, 1994, Vento went to the mall office with a cashier's check for $770 to pay the store's rent for October, and asked to speak with Bradford. Vento and Bradford testified to different accounts of their conversation. According to Vento, he told Bradford that he had bought the store outright and now owned all of it, and showed Bradford the sale contract. Bradford congratulated Vento, and mentioned that he had already known that Vento and Taylor were discussing a sale of the store from previous conversations Bradford had with Taylor. Vento expressed an interest in a long term lease. Bradford consulted some files, and then told Vento that the space the store occupied "should" rent for $2700, and that Taylor had been getting "a decent deal at $770." Bradford also said that a long-term lease was a bad idea because sports card stores generally do not do well in malls. Vento asked Bradford what would be the longest lease he could get, and Bradford replied "maybe the longest we can do is a three-month or a six-month." Vento wanted to sign a lease at that point, but Bradford told him "not to worry" with it that month, to come back in January and he would "take care of" him.

Bradford testified that Vento told him he was "in the process" of buying the store from Taylor, not that he had completed the purchase. Bradford told Vento that Taylor had negotiated a lease that lasted through November and December, and that the lease was non-assignable. Bradford testified that he understood Vento to be Taylor's employee, and was never aware that Vento had actually acquired any ownership interest in the store. Vento, however, testified that Bradford knew Vento had been Taylor's partner.

Later on October 4, Vento finally confronted Taylor about his continued presence at the store, and the two argued about who owned the business. According to Vento, Taylor told him the business was worth a lot more than $7000, and that the $7000 should be just a down payment. Vento insisted that the two had executed a binding contract and the sale was completed. Vento testified that he called the police, but Taylor left before the police arrived. Taylor testified that he did not know Vento had called the police, and that he had left to go home and gather some papers to try to prove his ownership.

Taylor testified that he went to speak with Bradford on October 5 or 6 to tell him about the disagreement he had with Vento.[4] Bradford testified that Taylor ap-

proached him the morning of October 6 and briefly told him there might be a confrontation between him and Vento, but did not explain himself any further. Taylor testified that he told Bradford "what was going on" in "a roundabout way." After his conversation with Taylor, Bradford directed the mall's security guard to remain near the store.

That morning Taylor and Vento did have another confrontation. Taylor testified that he and his wife went to the store before it opened, and, upon discovering that his key no longer worked in the store's locks, waited for Vento. Taylor testified that when Vento arrived he walked over to confront him, and Taylor's wife went to call the police.[5] The mall's security guard, who was nearby as he had been instructed to be, also entered the store. Bradford also appeared on the scene shortly thereafter. Bradford explained in his testimony that he was nearby not for the purpose of intervening in any confrontation that may arise, but rather because he was checking on remodeling work being done at a neighboring store.

When the police arrived, they turned to Bradford for guidance in sorting out the argument between Taylor and Vento. According to Bradford, the police asked him whose name was on the lease, and he

4. Vento argues that "[l]ike conspirators are wont to do when confronted by inconsistencies in their testimony, Bradford and Taylor began to change their stories at trial to conform." After Bradford had already testified that the 6th was the date of the conversation, Taylor's testimony at trial went this way:

Q: ... you did go back that day and tell Mr. Bradford about that; didn't you, on October the 5th?
A: (by Taylor) On October the 5th?
Q: Yes. Did you talk to him?
A: I don't really remember. Like I said before, I——
Q: Let me ask you—
A: The dates are confusing. I've done—
Q: I understand.
A: This was two years ago.
Q: According to your deposition, ... on October the 5th ... you did come back, because you told Bruce Bradford that Roell was taking over your store ...

A: Well, like I said, I don't remember if it was the 5th or the morning of the 6th.
Q: Your deposition said it was the 5th.
A: I understand that. And also at the deposition I told you at that time I wasn't exactly positive of the times[,] either.

5. The parties contested the issue of who called the police. The police report listed Bruce Bradford as the complainant, and two police officers testified that the person who calls the police is listed as "the complainant." However, on cross-examination, the officers explained that they assumed Bradford had made the call because the call came from Valle Vista Mall, where Bradford was the manager, but that they could not be certain who had placed the call without consulting the log. Bradford himself denied calling the police.

informed them that Taylor's name was on the lease. According to Vento, Bradford told the police "the store belongs to Tom." According to one of the police officers present, Jose Angel Villarreal, Bradford told him that Taylor owned the shop, and that Bradford did not want Vento inside the mall since he was causing a scene. Officer Villarreal testified that the mall security guard also told him that Taylor was the owner. Another police officer, Charles Manning, testified that Bradford did not exactly state that Taylor was the owner, but rather that Taylor was the one with a lease agreement. Officer Manning testified that Bradford told him he wanted to file criminal trespass charges against Vento. Based on Bradford's statements and the fact that Vento had no papers to substantiate his claim of ownership, the police told him to leave. Officer Manning testified that Vento said he wanted to retrieve some papers from his home and come back to prove his ownership, but Manning advised him that if he came back, Bradford would charge him with criminal trespass and he would be arrested. Bradford testified that Taylor had asked the police to remove Vento from the store, and that he told the police "Mr. Vento hasn't done anything wrong in the mall." Bradford also testified that he never threatened to charge Vento with criminal trespass.

On October 17, 1994 Bradford and Taylor entered into a two-month lease to cover November and December. On November 23, 1994, Vento obtained an injunction restoring him as owner of the business. Vento testified that the value of the merchandise on hand in the store was $35,000—$40,000 less on November 23, when the business was given back to him, than it had been on October 6, when he was ejected. Vento paid $770 in rent for December, but was informed by the mall office that he still owed $1430, because the rent rose in December to $2200. On January 15, 1995 the mall locked Vento out of the store, charging that he owed $4168.66 in back rent and unpaid electricity bills. Eventually Vento made prospective arrangements for Louis Martin to pay the business's outstanding debts and buy the business from him.

However, before the deal with Martin could be consummated, Martin wanted to see the inventory of the business. Vento testified that he was told that the only way he and Martin could have a key to see the store was if he would sign a statement releasing the mall from all liability. Vento refused to sign such a release, and he and Martin left. Bradford testified that, although he was not in the office when Vento and Martin appeared, his employees phoned him to advise him of the situation and seek his instructions. According to Bradford, Vento was not asked to sign a release, but rather a "receipt" specifying that the money received from Martin would be to satisfy Vento's debts and not for any other purpose, such as rent on a new lease. Bradford testified that his employees told him that Martin left because he considered the situation too confusing. One week later, Vento was allowed to remove his merchandise without a release. Vento testified that when he entered the store, it was in "total disarray" and not at all as he had left it. He estimated that approximately $500 in merchandise was missing.

Vento also attempted to demonstrate a close relationship between Bradford and Taylor. He testified that Taylor sold Christmas trees on the mall parking lot. There was testimony from Bradford and Joyce Plohocky, another mall administrator, that the $770 rent Taylor was paying was far below standard rates. Vento also testified that he told Bradford that Taylor was under-reporting the monthly sales of the business to the mall as a means of lessening the portion he was required to pay to the mall, but Bradford was unconcerned.

## II. Evidentiary Sufficiency Standards

We will begin with the appellants' challenges to the findings in appellees' favor on their various theories of liability. In reviewing a legal sufficiency challenge, we

consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting,* 964 S.W.2d 276, 286 (Tex. 1998). Anything more than a scintilla of evidence is sufficient to support the finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). When confronting a factual insufficiency challenge, we overturn findings only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996).

■ Most of the evidence in this case came in the form of testimony from interested witnesses. Testimony by an interested witness may establish a fact as a matter of law only if the testimony could be readily contradicted if untrue, and is clear, direct, positive, and there are no circumstances tending to impeach or discredit it. *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989). If there is nothing to cast suspicion on the testimony, that is, if reasonable minds could not differ, then the jury must accept the testimony. William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence",* 69 Tex. L.Rev. 515, 524 (1991). But, if the testimony is impeached, inconsistent, or otherwise suspect (even though not directly controverted), that is, if reasonable minds might or might not accept it, then the jury may reject it. *Id.* The jury is free to reject an interested witness's uncorroborated testimony based on its observation of the witness's demeanor, attitude, and similar factors incapable of reproduction in a written record. *Silva v. Enz,* 853 S.W.2d 815, 818 (Tex.App.— Corpus Christi 1993, writ denied). In this case, the testimony of the various interested witnesses differs sharply and is in many instances directly contradictory, leaving the jury with no choice but to make decisions regarding which witnesses to believe and which not to believe.

## III. Fraud

■ We first consider appellants' challenges to the jury finding on fraud. The jury charge, taken from the Texas Pattern Jury Charges, instructed the jury:

Fraud occurs when——

a. A party makes a material misrepresentation,

b. The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

c. The misrepresentation is made with the intention that it should be acted on by the other party, and

d. The other party acts in reliance on the misrepresentation and thereby suffers injury.

This instruction informed the jury of the elements of common law fraud, which are: (1) a material misrepresentation, (2) the defendant knew the statement was false or made the statement recklessly without any knowledge of its truth, (3) the defendant intended the plaintiff to rely upon the statement, (4) the plaintiff relied upon the statement (5) to his detriment. *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977); *Harrison v. Bass Enters. Prod. Co.,* 888 S.W.2d 532, 536 (Tex.App.— Corpus Christi 1994, no writ).

The jury was also instructed:

Fraud may also occur when——

a. A party conceals or fails to disclose a material fact within the knowledge of that party,

b. The party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. The party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. The other party suffers injury as a result of acting without knowledge of the undisclosed fact.

This instruction informed the jury of the elements of "fraudulent concealment," also

known as "fraudulent nondisclosure." Appellants did not challenge the instruction or its submission to the jury at trial, and do not challenge it in this appeal.

■ For there to be actionable nondisclosure fraud, there must be a duty to disclose. *Hoggett v. Brown*, 971 S.W.2d 472, 487–88 (Tex.App.—Houston [14th Dist.] 1997, no writ). Whether such a duty exists is "entirely a question of law." *Id.; Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex.App.—San Antonio 1993, writ denied). A duty to disclose may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression. *Hoggett*, 971 S.W.2d at 487 (citing *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 941 S.W.2d 138, 146–47 (Tex.App.—Corpus Christi, 1995), *rev'd on other grounds*, 960 S.W.2d 41 (1997); *Ralston Purina*, 850 S.W.2d at 635–36).

■ Appellees point to two incidents of fraud, both arising from a meeting between Vento and Bradford at the mall office on October 4, 1994:(1) Bradford's misrepresentation that Vento could continue operating the store under the existing lease for $770 per month, and (2) Bradford's failure to disclose certain requirements Vento would be required to meet prior to his acceptance as a tenant.

Vento testified that during the October 4 meeting, he told Bradford that he had purchased the store, showed him a copy of the sales contract, and expressed interest in executing a long-term lease. He further testified Bradford congratulated him on his purchase of the store, checked the mall files on the property, and told Vento the $770 rent Taylor had been paying was "a decent deal." According to Vento, Bradford accepted the $770 October rent check, told Vento he "probably" could arrange a

lease for up to three to six months, and in response to Vento's expressed interest in a new lease, told him not to worry, to come back in January, at which time he would "take care of" Vento's concerns. Although Vento asked specifically about arrangements for a new lease and Bradford reviewed the store's lease file during the meeting, Bradford failed to advise Vento that additional rent would be due for December and that he would be required to apply for a new lease.

The jurors could reasonably have concluded that Bradford knew Vento was the new owner and that he acknowledged Vento's ownership by congratulating him and accepting the October rent payment from him. Bradford admitted that he reviewed the store's file during his meeting with Vento in response to Vento's inquiries about a long-term lease. Vento testified that neither Bradford nor Taylor ever showed him a copy of the existing lease, even though he requested a copy from Taylor on several occasions. Vento's questions to Bradford about the lease were sufficient to show Vento's ignorance about the lease and Bradford's knowledge that Vento lacked such information.

Vento testified Bradford failed to inform him that the lease was non-assignable and he would be required to reapply as a prospective tenant, and that an additional amount of rent was due for December. The jury could reasonably have concluded Bradford chose not to disclose such information in order to induce Vento to retain the store in its mall location.

Moreover, Bradford's assurance that he would "take care of" Vento's long-term lease concerns in January and his failure to disclose pertinent information regarding the procedures for obtaining a new lease constituted a partial disclosure which conveyed a false impression. A duty to disclose information may arise when one makes a partial disclosure and conveys a false impression. *See Formosa Plastics*, 941 S.W.2d at 147. When Bradford responded to Vento's inquiries about a new

lease by accepting the rent check in the amount of $770 and telling Vento he would "take care of" him in January, he conveyed the false impression that any rent increase would not occur until January at the earliest, and that executing a new lease was a mere formality.

Vento relied on Bradford's assurances that he would "take care of" him in January and did not demand a copy of the lease from Bradford. As a result, Vento testified that he lost his inventory and personal collection, which Taylor sold, and for which the mall collected a percentage of the sales revenues. After considering the evidence, we find there is legally and factually sufficient evidence to support the jury's finding of fraud, and accordingly, overrule appellants' second point of error.

## IV. Civil Conspiracy

■■■ A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex.1995). Civil conspiracy requires specific intent, that is, the parties must be aware of the harm or wrongdoing at the inception of the combination or agreement. *Id.*

Appellees point to three incidents of alleged civil conspiracy. The first was a plan between Bradford and Taylor to oust Vento from his store and sell Vento's merchandise, with Taylor and the mall gaining the proceeds. The second was the lease signed by Bradford and Taylor on October 17, which authorized Taylor to sell the business's merchandise in the mall, when both knew that the merchandise now belonged to Vento. The third involves the unjustified refusal of Bradford, Simon, and Golden to accept Louis Martin's check to pay Vento's debts unless Vento also agreed to sign a statement releasing the mall from all liability.

Adopting the proper approach to the evidence when conducting legal sufficiency review, that is, viewing all of the evidence in the light most favorable to the appel-

lees, indulging every reasonable inference in their favor, and remaining mindful that the jury was free to resolve contradictions in the testimony and disbelieve the uncorroborated testimony of any interested witness, the testimony in this case is distilled this way: Vento bought the business from Taylor for $7000. Vento went to Bradford's office to pay the $770 rent for October, where he told Bradford that he and Taylor were no longer partners but rather that he now owned the business outright. Bradford responded to Vento's inquiries about a long-term lease by telling him "not to worry" with it that month and that he would "take care of" Vento in January. Two days later, Taylor and Bradford spoke briefly about a likely confrontation between Vento and Taylor. When the confrontation came and the police turned to Bradford for guidance, he told them that Taylor, not Vento, was the rightful owner of the business, and told them to eject Vento under the threat of criminal trespass charges if he returned. Eleven days after that, Bradford entered into a lease agreement for November and December with Taylor, despite knowing that Taylor had sold out to Vento.

When Vento was able to reenter his store under an injunction, $35,000—$40,000 worth of merchandise was missing. Although Vento was back in control of the business, he was unable to pay the full December rent or the past due debts of the company, and he was locked out of the business for his failure to pay these debts. When Vento arranged for a buyer to satisfy his debts, Bradford and the other mall office employees initially insisted that Vento release the mall from all claims before permitting him to show his merchandise to the potential buyer. The buyer left without completing the sale and did not return until Vento was permitted to show him the store without signing the release form. When Vento was allowed to reenter the store, he found that more merchandise was missing. It is undeniable from these facts that Vento was wronged by these events. However, the weakness in the appellees'

civil conspiracy allegation is the paucity of evidence showing that Bradford and Taylor agreed to work together.

Appellees refer us to *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex.1963), which stated that, in conspiracy cases,

> the injured party must necessarily have recourse to circumstantial evidence. For it is only by the inferences and deductions which men properly and naturally draw from the acts of others in such cases, that their intentions can be ascertained. They are not likely to proclaim them in the hearing of witnesses.

To that end, appellees point to several pieces of circumstantial evidence in support of the jury's verdict. Appellees argue that the evidence shows a close relationship between Bradford and Taylor, pointing to Taylor's low rent, Bradford's apparent lack of concern that Taylor may have been shortchanging the mall on the percentage of his store's sales owed to the mall, and the Christmas tree deals between the two. Appellees argue that Bradford was motivated by a need to recover money owed to the mall by Taylor, who had proven to be unreliable in meeting his financial obligations. Under this theory, Bradford and Taylor plotted to induce Vento to bring his merchandise into the store and then remove him, leaving Taylor to sell Vento's merchandise, which would enable Taylor to pay off his debts while also allowing a profit for both of them.[6] Appellees also suggest that Bradford was looking forward to removing the sports memorabilia store from the mall altogether and replacing it with a different kind of store.

■ We will first examine appellees' pieces of circumstantial evidence one at a time. We first consider whether the rent on Taylor's store indicates whether Bradford and Taylor had a close relationship wherein Bradford offered special favors to Taylor. Bradford testified that Taylor was part of the mall's "Retail Development Program" (RDP), a program that offered reduced rental rates for small businesses. Taylor's acceptance into the RDP and his negotiation for a base rent of $770 both preceded Bradford's arrival at the mall in March, 1993. At any given time, there were approximately two dozen other RDP tenants in the mall. Bradford also testified that if Taylor were not operating his store in the space, the space would be empty because there were more spaces at the mall than tenants to fill them. This testimony was clear, positive, direct, and could be readily contradicted if untrue. *Lofton*, 777 S.W.2d at 386. The record evidence does not provide any indication that Taylor received preferential treatment from Bradford regarding his rent.

■ We next consider Bradford's attitude about Taylor shortchanging the mall on its percentage of the store's sales. Vento testified that he told Bradford that Taylor had been under-reporting his sales to avoid paying overages, but Bradford "just raised his hands and said 'what are you going to do about it. You know, what can I do?'" Vento also testified that "there was no auditing system" in the mall for checking the sales reported by mall tenants. It appears from Vento's own testimony that while Bradford may have been somewhat lax about collecting the overages, there was no indication that Bradford showed any special preference for Taylor in this regard. Bradford testified that one to three tenants would be audited each year, and that the mall always selected tenants from whom it was likely to get the most money out of the audit. RDP tenants were never audited because the audits were very expensive and the mall would not recoup the cost of the audit. This testimony was also clear, positive, direct, and could be readily contradicted if untrue. *Id.* We conclude that Bradford's attitude regarding the overages from Taylor's store does not lend any support to appellees' conspiracy theory.

---

6. Under the terms of the store's lease, the tenant was obligated to pay the mall "overages" of 12.5% of all monthly sales in excess of $8,375.

Appellees also questioned Bradford's practice of continuing to do business with Taylor involving the sale of Christmas trees after Taylor had failed to pay the electricity bills for the store. Taylor and his wife were the local representatives of Sunnyview Christmas Tree Farm, a company that sold Christmas trees and negotiated leases for space to sell the trees in the mall parking lot. Bradford explained that Sunnyview always paid their rent up front, and there had never been any trouble with Sunnyview at the mall. Neither Taylor nor his wife were ever involved in any of the lease negotiations between the mall and Sunnyview. Here again, we fail to see how Bradford's willingness to continue doing business with Sunnyview provides even circumstantial evidence of a conspiracy between Bradford and Taylor.

We next consider Bradford's possible financial motivations for conspiring to remove Vento and reinsert Taylor. One of the premises of this theory is appellees' argument that Taylor had become unreliable in meeting his financial obligations. Appellees argue "Taylor couldn't pay rent without bouncing checks and he hadn't paid electricity since May." It is true that Taylor had a history of bouncing rent checks. However, Bradford testified that Taylor always "made up" his payments. The mall had also taken steps to relieve themselves of the inconvenience of bounced checks from Taylor by requiring him to pay his rent by cashier's check. Regarding the unpaid electricity bills, it is important to note that, according to Vento, he and Taylor became partners in May or June. Therefore, Vento would also be liable for a portion of the unpaid electric bills. We agree with appellees that there is some evidence indicating that Taylor's bill-paying habits were not very good.

Of course, this evidence was presented not merely to show that Taylor's bill-pay-ing habits were not very good, but to suggest that, by tolerating Taylor's debt-prone habits, Bradford showed preferential treatment for Taylor, which, in turn, supports the likelihood that the two would later conspire together. However, a chain of inferences can only be stretched so far before it breaks. Vital facts may not be proven by unreasonable inferences or by piling inference upon inference. *Bernstein v. Portland Sav. and Loan Assoc.*, 850 S.W.2d 694, 706 (Tex.App.—Corpus Christi 1993, writ denied). We believe appellees' argument stretches the evidence past the breaking point.

This brings us to the next premise in appellees' argument, that it served Bradford's financial interests to have Taylor, not Vento, running the store. Appellees' theory is that Bradford needed Taylor to remain at the mall so he could make enough to pay the money he owed for electricity. However, as mentioned above, Vento was also liable for approximately half of the electricity bills.[7] Appellees also discuss how inducing Vento to move his merchandise into the store and then replacing him with Taylor allowed the mall to profit from the overages that would be made on Vento's merchandise. Even disregarding the argument made elsewhere by appellees concerning Taylor's habit of under-reporting his sales to avoid paying overages (which would suggest that Vento was preferable to Taylor as a tenant), it is not apparent why it would be more profitable to the mall to have Taylor selling Vento's merchandise than it would be to have Vento selling Vento's merchandise. All Bradford stood to gain by conspiring to reinstall Taylor was an improved chance to recover the portion of the store's unpaid electric bills that Taylor was individually liable for. Taylor had also indicated several times that he wanted to get out of the business, while Vento was eager for a long-term lease. It appears contrary to Bradford's long-term interests to permanently

---

7. The total amount due for electricity was $1356.62. However, $719.69 of this was for the period from June 16 to September 15, when Vento was a partner in the business and was, arguably, equally responsible for the business's debts. The bills from March 15 to June 15, for which Taylor was individually responsible, totaled $636.93.

sabotage Vento's business, when all he stood to gain was recovery of a portion of the unpaid electric bills. Although appellees suggest that Bradford desired to replace the sports memorabilia store with a different kind of store, the evidence indicates that the mall had vacant spaces for other tenants whether the sports memorabilia store left or not.

We hold that the evidence was insufficient to support a finding that Bradford and Taylor conspired to oust Vento from the store during the first week of October and replace him with Taylor.

■ Next, we consider the alleged conspiracy centering around the lease agreement entered into by Bradford and Taylor on October 17, wherein Taylor was given a lease for November and December. The lease was obviously a combination by two or more persons. However, we hold that the evidence was legally insufficient to show that Bradford knew that the lease to Taylor was for an unlawful purpose. If there were evidence that Bradford knew the lease would have the effect of facilitating Taylor's sale of Vento's merchandise, that would constitute evidence that Bradford knew that the lease was for an unlawful purpose. However, because the evidence shows that Bradford received conflicting information from Taylor and Vento regarding the ownership of the business, the evidence does not establish that Bradford knew conclusively that the business belonged to Vento.

Vento testified that on October 4 he told Bradford that he had bought the business from Taylor, and that he showed Bradford the contract.[8] However, on October 6, Bradford encountered a confrontation between Taylor and Vento, with both claiming ownership. Thereafter, Vento left the mall and according to his own testimony, did not return to the mall or have any further contact with Bradford for several weeks. Vento did not file his original peti-

tion contesting ownership of the business until November 8, 1994, roughly three weeks after Bradford and Taylor entered the lease. We hold that the evidence was legally insufficient to establish that Bradford knew Vento owned the business and that leasing to Taylor would be unlawful.

■ Regarding the allegation of a conspiracy between Bradford, Simon, and Golden in demanding a release from Vento of his claims against the mall, appellants respond that it is a rule of law that agents and their principals cannot conspire together, citing *Fojtik v. First Nat'l Bank,* 752 S.W.2d 669, 673 (Tex.App.—Corpus Christi 1988), *writ denied per curiam,* 775 S.W.2d 632 (Tex.1989). All parties concede that Bradford was the agent of Simon and Golden. Appellees argue, however, that there is no evidence to show that Simon and Golden were the same company, or that one was the subsidiary of the other, citing *Atlantic Richfield Co. v. Misty Prod., Inc.,* 820 S.W.2d 414, 420 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (a corporation can not conspire with itself, no matter how many corporate agents participate in the alleged conspiracy). The record provides scant indication of the relationship between Simon and Golden. There is only passing mention that they are "owners," with no further explanation provided. However, as the plaintiffs, appellees had the burden of providing adequate evidence to support their conspiracy cause of action. Therefore, they had the burden of proving that Simon and Golden were separate entities (and therefore could conspire together) rather than appellants having the burden of proving otherwise. Appellees failed to meet this burden. Appellants' first point of error is sustained.

## V. Tortious Interference with Prospective Contracts

We next consider appellants' challenges to the jury finding that they tortiously

---

8. The contract did not indicate that the sale had been consummated, but rather that "this sale will be finalized as soon as funds in the amount of $7,000 are paid." Although Vento told Bradford on October 4 that the sale had been completed, Taylor disputed whether a sale had been finalized.

interfered with appellees' prospective contractual relations. Appellants contend that appellees waived their right to recover on this cause of action by failing to secure a finding from the jury that they suffered damages as a result of this tortious conduct. We disagree.

■ Appellants' complaint centers around a typographical error in the jury charge. The jury charge in this case was designed so that first the jury was asked about liability and then an accompanying question asked about damages. For example, question 1 asked "Did any of the defendants commit fraud against Roell Vento?" The jury was instructed that, if they answered question 1 with a "Yes," they should answer question 1A, which asked about damages.

■ Question 8, which asked the jury about the elements of liability for tortious interference, specifically asked "Did any of the defendants listed below wrongfully interfere with plaintiff's prospective contractual relationships with their customers, proximately causing damages?" The jury answered "yes" to defendants Taylor and Bradford, but answered "no" to defendants Simon and Golden Ring. Question 8A was prefaced with the instruction: "If you answered question 8 "Yes" then answer this question. Otherwise do not answer the following question." However, question 8A actually asked "What sum of money, if paid now in cash, would fairly and reasonably compensate the plaintiffs for damages, if any, you attribute to the conduct complained of in question *no. 3* ?" (empha-

sis added). Question 3 asked the jury whether Taylor had breached his fiduciary duty as a partner to Vento. Appellees argue that the reference in question 8A to question 3 rather than question 8 is undoubtedly a typographical error. We agree. Throughout the jury charge, which ran thirty-three pages and included nineteen questions, the charge was consistently organized such that the jury was first asked about liability, and then, if they answered yes, an accompanying question asked about damages. The liability and damages questions shared the same question number for all causes of action except tortious interference with business relations. A jury's verdict should not be reversed based on a typographical error. *See Miller v. State*, 846 S.W.2d 513, 515 (Tex.App.—Texarkana 1993, pet. ref'd) (conviction should not be reversed because of typographical error in the jury charge); *see also Fain v. State*, 688 S.W.2d 235, 238–39 (Tex.App.—El Paso 1985, *aff'd* 725 S.W.2d 200 (Tex.Crim.App.1986)) (typographical error in jury charge susceptible to lay, common sense correction not grounds for reversal). We hold that the amount of damages listed by the jury in question 8A was properly incorporated into the court's judgment as damages for tortious interference with prospective contractual relations, and overrule appellants' third point of error.

■ To establish a cause of action for tortious interference with a prospective business relationship, the plaintiff must show: (1) a reasonable probability that a contractual relationship would have been entered; (2) an intentional, malicious intervention with the formation of that relationship; (3) without privilege or justification; [9]

**9.** The Texas Supreme Court held in *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689–90 (Tex.1989) that a claim of justification or excuse to interfere with *existing* contractual relations is an affirmative defense. The Supreme Court has not addressed whether the reasoning of *Sterner* extends to cases involving *prospective* contractual or business relations. A majority of post-*Sterner* decisions by the courts of appeal addressing the issue have not extended *Sterner to* cases involving pro-

spective contractual or business relations. *See, e.g., Garner v. Corpus Christi Nat. Bank,* 944 S.W.2d 469, 477 (Tex.App.—Corpus Christi 1997, writ denied); *Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89, 109 (Tex. App.—El Paso 1997, pet. denied); *Robles v. Consolidated Graphics, Inc.,* 965 S.W.2d 552, 561 (Tex.App.—Houston [14th Dist.] 1997, writ denied); *Tarleton State Univ. v. Rosiere,* 867 S.W.2d 948, 952 (Tex.App.—Eastland 1994, writ dism'd agr.); *Coastal Corp. v. At-*

and (4) resulting in actual damage or loss. *Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89, 109 (Tex.App.—El Paso 1997, pet. denied) (citing *Gonzalez v. San Jacinto Methodist Hosp.,* 905 S.W.2d 416, 421 (Tex.App.—El Paso 1995), *rev'd on other grounds sub nom., Calvillo v. Gonzalez,* 922 S.W.2d 928 (Tex.1996)); *see also Garner,* 944 S.W.2d at 477. It is not necessary to prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction. *Hill,* 964 S.W.2d at 109.

■ The prospective contractual relations identified by appellees were Vento's prospective contracts with the customers of his store, and later the prospective contract with Louis Martin to sell the business. In the present case, the charge to the jury regarding tortious interference with prospective contractual relations omitted the element of absence of justification, but no objection was raised at trial regarding the omission. A review of the evidentiary basis of a judgment includes both questions asked and questions omitted. *Crosbyton Seed Co. v. Mechura Farms,* 875 S.W.2d 353, 364 (Tex.App.—Corpus Christi 1994, no writ). When a jury awards damages based on a charge that omits an element necessary to sustain a ground of recovery, the trial court can either file a written finding regarding the missing element or render judgment without one. *See* Tex.R. Civ. P. 279; *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 437 (Tex.1995). If, as in the present case, the trial court does not file a written

finding, the omitted element is deemed found in support of the judgment as long as no objection was made and the evidence supports such a finding. *See* Tex.R. Civ. P. 279; *State Farm,* 907 S.W.2d at 437. The deemed findings must be supported by factually sufficient evidence. *Mechura Farms,* 875 S.W.2d at 364.

■ We first consider the contract to sell the business to Louis Martin. When Vento and Martin went to the mall office wishing to settle Vento's debts and view the business's merchandise to reassure Martin before the sale, they were told that they would not be permitted to enter the store until Vento signed a release form releasing the mall from all liability. Martin testified that if he had been permitted to view the store on the day he and Vento went to the mall office, he would have refused to consummate the deal due to the disheveled state of the store's merchandise. While Vento insinuates that Bradford and/or Taylor are responsible for the "total disarray" and missing merchandise, there is no evidence of who caused this destruction. Most importantly, there is no evidence that the destruction took place during the week between the day Vento and Martin went to the mall office and the day Vento was allowed to remove his merchandise. Without evidence that the destruction occurred that week, we may not presume that the store was in better condition on the first date, and Martin testified that his initial offer was premised on finding the store and its merchandise in good condition. We conclude that there is no evidence that Bradford's demand for a

*lantic Richfield Co.,* 852 S.W.2d 714, 720 (Tex.App.—Corpus Christi 1993, no writ); *Browning–Ferris, Inc. v. Reyna,* 852 S.W.2d 540, 548 (Tex.App.—San Antonio 1992) *rev'd on other grounds,* 865 S.W.2d 925 (Tex.1993); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied); *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 565 (Tex.App.—Dallas 1989, no writ) (all including absence of justification or excuse as element of plaintiff's case in cases involving tortious interference with prospective contractual or business relations). *But see, e.g.,*

*Weakly v. East,* 900 S.W.2d 755, 759 (Tex. App.—Corpus Christi 1995, writ denied) (omitting absence of justification or excuse as element of plaintiff's case for tortious interference with prospective advantage); *Caller–Times Publishing Co., Inc. v. Triad Communications, Inc.,* 855 S.W.2d 18, 21 (Tex.App.—Corpus Christi 1993, no writ) (omitting absence of justification or excuse as element of plaintiff's case for tortious interference with prospective contracts or business relationships).

release interfered with Vento's contract with Martin.

■ However, legally and factually sufficient evidence does support appellants' recovery for the prospective contracts with Vento's customers. The evidence shows a reasonable probability that contractual relations would have been entered into. Vento had considerable experience in selling sports memorabilia, a large collection of merchandise, and an established and expanding customer base. He also testified to the volume of customer sales at the store during his association with Taylor and following his purchase of the store.

■ Appellants contend that appellees have failed to satisfy this element of the cause of action because they failed to identify any specific contract that had been interfered with, citing *Robles v. Consolidated Graphics, Inc.,* 965 S.W.2d 552, 561 (Tex.App.—Houston [14th Dist.] 1997, pet. denied). We do not agree that *Robles* supports appellants' position, or that appellants' position is a correct statement of the law. The actual holding in *Robles* was to uphold a summary judgment in favor of the defendant on the ground that one prospective contract was illegal and unenforceable as against public policy, and, with regard to the other contract at issue, the defendant's conduct was justified. *Robles,* 965 S.W.2d at 561. Although the facts of *Robles* concern specific contracts, there is no language in the *Robles* opinion requiring the identification of specific contracts. Rather, all Texas law requires is "a reasonable probability that the parties would have entered into a contractual relationship." *Garner,* 944 S.W.2d at 477.

There is also sufficient evidence to support the second element, an intentional and malicious intervention with the formation of the contractual relationship. Vento testified he told Bradford that he had purchased the store and showed him the signed sales contract during the October 4 meeting. According to Vento, when the police were called to the store two days later on October 6, in response to the dispute between Vento and Taylor, Brad-

ford failed to tell the police of his knowledge regarding Vento's claims of ownership or even that it was his understanding that Vento was in the process of purchasing the store; instead, he unequivocally told the police "the store belongs to Tom [Taylor]." Vento also testified that he was forced to leave the store and deprived of any opportunity to conduct business when, at Bradford's direction, the police advised him to leave the store and threatened to arrest him on charges of criminal trespass if he returned.

The evidence similarly supports the deemed finding of the third element, absence of privilege or justification. As manager of the mall, Bradford may have been justified in telling the police that although ownership of the store was in dispute, the mall's records nonetheless reflected that Taylor was the leaseholder of a non-assignable lease. Bradford was not justified, however, in telling the police that Taylor owned the store, without mentioning that Vento had paid the rent two days earlier and had told him he was the new owner.

The jury considered the emotional distress, mental anguish, and lost profits caused by Bradford's tortious conduct, and found that the Ventos would be fairly and reasonably compensated for such tortious interference by awarding them $20,000 in damages for lost profits and $10,000 in damages for mental anguish. As a result of Bradford's statements to the police, Vento was denied access to his property and deprived of the opportunity to conduct business from October 6 until November 23, 1994, at which time he returned to the store to find the value of the store's inventory was approximately $35,000 to $40,000 less than it had been on October 6 when he was ejected from the property. We hold the evidence shows that Vento suffered damages because of Bradford's tortious conduct, and overrule appellants' fourth point of error.

## VI. Intentional Infliction of Emotional Distress

■ Next, we consider appellants' challenge to the legal and factual sufficien-

cy supporting the jury finding in favor of appellees on their claim for intentional infliction of emotional distress. To recover under this tort, the plaintiff must prove that 1) the defendant acted intentionally or recklessly, 2) the conduct was "extreme and outrageous," 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the resulting emotional distress was severe. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993). The "intent" element of this tort requires that the actor either intend to cause severe emotional distress, or that severe emotional distress be the primary risk created by the actor's conduct. *Standard Fruit and Vegetable Co., Inc., et. al. v. Johnson,* 985 S.W.2d 62, 63 (Tex. 1998).[10] Rude behavior does not equate to outrageousness, and behavior is not outrageous simply because it is tortious. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994). Rather, the "outrageous" element is meant to require behavior that is "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). "Severe emotional distress" means distress so severe that no reasonable person could be expected to endure it without undergoing unreasonable suffering. *Benavides v. Moore,* 848 S.W.2d 190, 195 (Tex.App.—Corpus Christi 1992, writ denied).

■■■ Appellees point to six actions taken by Bradford which they argue were extreme and outrageous. They are: (1) misleading Vento into believing he was secure in his status as a tenant; (2) conspiring with Taylor to deprive him of the business and his personal collection, much of which was located in the store; (3) lying to the police about who owned the business and threatening Vento with trespass charges; (4) subsequently entering a lease with Taylor that facilitated Taylor's sale of Vento's property; (5) allowing Vento's property to be ransacked and stolen while Vento was locked out of the store; and (6) demanding that Vento release all claims before releasing a key when Vento and Martin came to pay Vento's debts and see the store.

The evidence supports the jury's finding of liability for intentional infliction of emotional distress. Bradford's threatening Vento with criminal trespass charges, his unequivocal statement to the police that Taylor was the owner of the store, and his failure to inform the police of the dispute over ownership are evidence that Bradford's conduct was extreme and outrageous and caused Vento to suffer severe emotional distress. The jury could reasonably have concluded that Bradford's conduct was intended or primarily likely to cause Vento severe emotional distress. Vento testified that at Bradford's direction, he was forced to leave the store on October 6 without being allowed to retrieve any personal belongings, including items from his personal collection. He also testified that following his ejection from the store, he became depressed and physically ill, lost weight, suffered nausea and loss of appetite, and was embarrassed and humiliated by having to explain his plight to former customers. He testified that sports memorabilia collectors and dealers are a "very tight" community, that people heard that "something is going on,"

---

**10.** *Standard Fruit* involved an independent claim of intentional infliction of emotional distress based solely on the *reckless* conduct of the defendant. The court held that recovery for intentional infliction of emotional distress is "available only in those situations in which severe emotional distress is the *intended* consequence *or* primary risk of the actor's conduct." *Standard Fruit,* at 67 (emphasis added). Thus, recovery for intentional inflic-

tion of emotional distress is only barred "when the risk that emotional distress will result is merely incidental to the commission of some other tort." *Id.* at 68. Recovery *is* available if the "conduct is intended or primarily likely to produce severe emotional distress ... even if the actor's conduct also produces some other harm, such as physical injury." *Id. at* 67.

and that his reputation and credibility were irreparably damaged by being "thrown out" of his own store.

Appellees also identified Bradford's refusal, in January 1995, to allow Vento access to the property unless he agreed to execute a release of all claims against the mall. Vento had requested access for the limited purpose of showing the property to Louis Martin, a prospective buyer. Bradford's conduct was extreme because it was unjustified, unnecessary to protect the mall's interests, and interfered with Vento's opportunity to sell the property. Moreover, the jury could reasonably have concluded that the "primary risk" created by Bradford's conduct was severe emotional distress for Vento. We find the evidence legally and factually sufficient to support the jury's finding of liability for intentional infliction of emotional distress and overrule appellants' fifth point of error.

### VII. Single Injury; Joint and Several Liability for Actual Damages; Improper Stacking of Damages

■ Appellants contend that, if we determine that the jury's finding of a civil conspiracy was not supported by legally sufficient evidence, then there is no basis for making the appellants jointly and severally liable for the damages attributable to Taylor. However, a civil conspiracy is not the only basis for imposing joint and several liability. Joint and several liability is also appropriate when the tortious acts of multiple tortfeasors combine to produce a single, indivisible injury. *Austin Road Co. v. Pope*, 147 Tex. 430, 216 S.W.2d 563, 565 (1949); *Bristol–Myers Co. v. Gonzales*, 548 S.W.2d 416, 427 (Tex.Civ.App.—Corpus Christi 1976, *rev'd on other grounds*, 561 S.W.2d 801 (Tex.1978)). The term "indivisible injury" means an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers. *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 654 (Tex. 1996) (citing *Landers v. East Tex. Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731, 734 (1952)).

■ This is such a case where the injuries suffered by the Ventos cannot be apportioned with reasonable certainty to the individual wrongdoers. For example, the mental anguish suffered by the appellees that resulted from Taylor's fraud and breach of fiduciary duty cannot be distinguished from the mental anguish suffered as a result of Bradford's tortious interference with prospective contractual relations. Similarly, it is not possible to separate the profits lost by the appellees as a result of Taylor's wrongdoing from the profits lost as a result of Bradford's wrongdoing. The tortious acts of Bradford and Taylor, although not executed pursuant to any concerted scheme, nevertheless combined in effect to produce singular, indivisible injuries to the appellees that cannot be apportioned among the appellants.

■ It seems most appropriate to us that, in a case such as this, involving multiple defendants and multiple causes of action which nevertheless produce a single injury, the jury should first be asked about liability issues, and then, if they have made findings sufficient to impose liability, the jury should be instructed to answer one set of damages questions that simultaneously pertains to all the causes of action and all of the defendants. However, the jury charge in this case required that the jury assess the damages for each cause of action, and the jury found differing amounts for the various types of damages under the various causes of action. The relevant jury findings are described in this table:

| Question Number | Cause of Action | Liable Defendants | Type of Damages | Amount of Damages |
|---|---|---|---|---|
| 1A | fraud | Bradford Taylor Simon & Golden | property lost in reliance | $ 14,000 |
| 1A | fraud | Bradford Taylor Simon & Golden | Mental anguish | $750,000 |
| 3A | breach of fiduciary duty | Taylor | lost profits | $100,000 |
| 3A | breach of fiduciary duty | Taylor | mental anguish | $250,000 |
| 6B | DTPA "laundry list" | Bradford and Taylor | Lost use of property | $100,000 |
| 6B | DTPA "laundry list" | Bradford and Taylor | expenses | $ 20,000 |
| 6C | DTPA "laundry list" | Bradford and Taylor | lost profits | $100,000 |
| 8A | tort. interference with contract | Bradford and Taylor | lost profits | $ 20,000 |
| 8A | tort. interference with contract | Bradford and Taylor | mental anguish | $ 10,000 |
| 10 | DTPA "unconscionable" | Bradford and Taylor | omitted | omitted |

Therefore, we are confronted with mental anguish findings of $750,000, $250,000, and $10,000; lost profits findings of $100,000[11] and $20,000; and a finding of $14,000 in property lost in reliance on fraud.

Texas recognizes the "one satisfaction" rule, which prevents a plaintiff from obtaining more than one recovery for the same injury. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex.1991). This rule applies when defendants commit the same act as well as when defendants commit differing acts which result in a single injury. *Id.* A jury award of differing amounts for the same type of damages under different causes of action does not prevent the application of the one satisfaction rule if the plaintiffs suffered only one injury. *Berry Property Management v. Bliskey*, 850 S.W.2d 644, 666 (Tex.App.— Corpus Christi 1993 writ dism'd by agr.). Where the prevailing party has not elected a single recovery from among the jury's findings, the court should use the findings affording the greater recovery and render judgment accordingly. *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex.1987). Applying this rule to the facts of this case, we hold that the Ventos are limited to electing only $750,000 in mental anguish damages, $100,000 in lost profits, and $14,000 in property lost in reliance on fraud.[12] Because the wrongful acts of Taylor and Bradford combined to produce these damages and the damages cannot be reasonably apportioned between them, the

11. We consider the jury's findings of $100,000 in "lost use of property" to be the same as a finding of $100,000 in lost profits. The "property" that Vento lost the use of was his store and merchandise. The value Vento lost from being deprived of the use of this property was the ability to make profits.

12. By this holding, we sustain appellants' eleventh point of error, which argued that the appellees had been improperly permitted to stack their recoveries.

appellants are jointly and severally liable with Taylor for the full amount of actual damages which survives appellants' various challenges in this appeal.

## VIII. DTPA

Finally, we consider appellants' challenge to the jury finding in favor of appellees on their DTPA claim and the appellees' cross point which argues that the trial judge erred in requiring them to elect between remedies, which prevented them from recovering the damages awarded by the jury on their DTPA cause of action.

The elements of a DTPA "laundry list" cause of action are: (1) the plaintiff is a consumer, (2) the defendant engaged in a false, misleading, or deceptive act or practice, (3) that was relied on by the consumer, and (4) that constituted a producing cause of the consumer's actual damages. TEX. BUS. & COM.CODE ANN. § 17.50(a)(1) (Vernon 1987).[13] Although the appellants argue that there was insufficient evidence that Bradford committed a "laundry list" DTPA violation, they did not challenge the sufficiency of the evidence supporting a violation by Taylor, and we have determined that the appellants are jointly and severally liable for the actual damages assessed by the jury on all causes of action. Furthermore, the damages found by the jury on the "laundry list" DTPA claim are no greater than those found by the jury on other causes of action brought by the appellees, which we have already found to be supported by factually and legally sufficient evidence. Therefore, the appellants' arguments that Bradford did not commit a "laundry list" DTPA violation are moot.

The jury also found that Taylor and Bradford had committed DTPA "unconscionable" violations. The elements of a DTPA "unconscionable" cause of action are (1) the plaintiff is a consumer, (2) the defendant engaged in an unconscionable action or course of action, (3) that constituted a producing cause of the consumer's damages. TEX. BUS. & COM.CODE ANN. §§ 17.50(a)(1); 17.50(a)(3) (Vernon Supp. 1987).[14] An "unconscionable action or course of action" is "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree" or "results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration." TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon 1987).[15] Proof that a defendant has taken advantage of a consumer's lack of knowledge, ability or experience to a grossly unfair degree requires proof of "resulting unfairness that was glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985). For determining whether one is a consumer under the DTPA, the Texas Supreme Court has adopted this test: (1) acquiring or seeking to acquire goods or services by purchase or lease and (2) those goods or services must be the basis of the complaint. *Id.* at 581.

However, the jury charge did not ask the jury to assess damages for this cause of action. The appellees urge us to consider the entire actual damages awarded by the trial court, $1,274,000, as a

---

**13.** Section 17.50(a)(1) of the business and commerce code was amended by Acts 1989, 71st Leg., ch. 380, § 2, effective September 1, 1989, and by Acts 1995, 74th Leg., ch. 414, § 5, effective September 1, 1995. *See* TEX. BUS. & COM.CODE ANN. § 17.50(a)(1) (Vernon Supp.1999). A lawsuit, like the present action, filed on November 8, 1994, prior to the effective date of the 1995 amendments, is governed by the law applicable to the claim prior to the effective date of the amendments. The changes are not relevant to our discussion.

**14.** The 1995 amendments did not effect the text of Section 17.50(a)(3). *See* TEX. BUS. & COM.CODE ANN. § 17.50(a)(3) (Vernon Supp. 1999).

**15.** Section 17.45(5) was amended in 1995 to delete the "gross disparity" prong of the definition. *See* TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon Supp.1999). The amendment is not relevant to our discussion.

deemed finding on the damages issue under rule 279. The judgment stated that "Defendants Simon Property Group L.P., Golden Ring Mall Company, Bruce Bradford, individually and Tom Taylor individually are jointly and severally liable for damages found by the jury in questions 1A, 3A, 8A, 9A, 11A(c) which total $1,274,000." The actual total of the amounts the jury awarded in the answers listed by the trial court is $1,393,000. Had the figure in the trial court's judgment *exceeded* the total amount the jury awarded for the causes of action the trial court intended to include in the judgment, it might be possible to infer that the trial court intended the excess to reflect a deemed finding of damages for the Ventos' DTPA cause of action. However, because the trial court awarded *less* than the jury awarded for the causes of action the trial court apparently intended to include in the judgment, we cannot say that any of the trial court's award of actual damages was meant to reflect a deemed finding of damages for the Ventos' DTPA cause of action. Furthermore, the trial court's delineation of the amounts awarded by the jury for the various causes of action that contributed to the overall actual damages award works against the Ventos' argument that the judgment contains a deemed finding of damages on their DTPA causes of action. The court did not include the Ventos' recovery under the DTPA in its itemization. Therefore, it is not possible to conclude that recovery of any amount of damages under the DTPA "support[s] the judgment." Tex.R. Civ. P. 279.

The harm caused to the appellees by the misconduct underlying both DTPA causes of action was the same. Therefore, the appropriate damages on the appellees' DTPA "unconscionable" cause of action are no more than those awarded by the jury on the appellees' DTPA "laundry list" cause of action, and it is of no consequence whether the appellees recover on both of their DTPA theories or only one. Therefore we need not rule on appellants' ninth point of error arguing that the evidence was legally and factually insufficient to support recovery for the appellees on their DTPA claims.

## IX. Mental Anguish Damages

We have determined that the appellees must select a single award for mental anguish damages. In this case, their fraud cause of action, for which the jury awarded them $750,000 in mental anguish, gave them the maximum recovery.

Mental anguish damages may be awarded when there is direct evidence of the nature, duration, or severity of the plaintiff's anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). There must also be evidence that the amount of mental anguish damages found is fair and reasonable, and the appellate court must conduct a "meaningful evidentiary review" of the amount found. *Saenz v. Fidelity Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996).

In this case, Vento testified that when he was ejected from his property on October 6, he was "confused, dazed, upset," and "so mad [he] couldn't even drive." He further testified:

Q. So how did it feel knowing that you bought this store, got a loan for it, thousand dollars of dollars (sic) and you literally kicked out of your own store?
A. It feels like if they take, you know— it's like if they took you— I don't know. I can't explain it. It's unexplainable. I mean, it feels really bad. Until it happens to somebody you know what I mean. They take part of your life away. Everything you work for at that point, all the money we sunk in, all the inventory, personal items, they just let some guy take it, you know. It seems very simple for someone to just go in and in three minutes ruin your life. And it takes you a struggle and two years,

**738**

three years later to try to see if you can get it back. It feels bad.

There was evidence that Vento could not eat after these incidents, and became very thin and ill as a result. Debbie Vento testified that he would not leave the house, and had to be "dragged" to go work with his brother so that he wouldn't be home all the time, thinking about what had happened to him. Vento also testified that he frequently ran into collectors and other people he had known in the sports memorabilia business, and the embarrassment of those encounters was "the worst part." Vento also testified that the emotional effects of the events underlying this case had not improved as of the time of trial. We hold that the evidence shows the nature, duration, and severity of Vento's emotional distress, as well as a consequent substantial disruption in his daily routine.

We next must consider the amount of damages awarded. Although the Texas Supreme Court has mandated "meaningful evidentiary review" of the size of mental anguish awards, the incorporeal nature of mental anguish damages continues to make it a rare case where we can say that the jury's findings are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Put simply, how can something so hazy as the dollar amount of mental anguish damages be *"clearly* wrong?" While there may be some cases where the amount awarded is clearly wrong, this is not one of those cases. In this case, Vento had devoted his life to building his collection with the ultimate goal of operating his own sports memorabilia store. Just as he was about to realize that goal, it was wrongfully snatched from him, and he was put back in a position from which it would take years to recover. After reviewing the size of the jury's award for mental anguish as meaningfully as we can, we hold that the award of $750,000 in mental anguish damages is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust, and overrule appellants' sixth point of error. *See id.*

### X. Lost Profits

We next consider appellees' recovery for lost profits. Here again, we have determined that the single injury rule requires that the appellees be limited to a single recovery of $100,000. To recover for lost profits, a party must show by competent evidence the amount of the loss with reasonable certainty. *Texas Instruments v. Teletron Energy Mgt.,* 877 S.W.2d 276, 279 (Tex.1994). It is not necessary that profits should be susceptible to exact calculation; it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness. *Id.*(quoting *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938)); *Thedford v. Missouri Pac. R. Co.,* 929 S.W.2d 39, 49 (Tex.App.—Corpus Christi 1996, writ denied). Where the business is established and making a profit at the time when the contract was breached or the tort committed, such profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. *Texas Instruments,* 877 S.W.2d at 279.

What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Id.* (citing *Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992)). The requirement of "reasonable certainty" in the proof of lost profits is intended to be sufficiently flexible to accommodate the myriad of circumstances in which claims for lost profits arise. *Id.* Although supporting documentation may affect the weight of the evidence, it is not necessary to produce the documents supporting the opinions or estimates of lost profits. *Holt,* 835 S.W.2d at 84.

Much of the appellants' argument on appeal is an attack on the testimony of the expert witness who estimated Vento's future earnings. Appellants argue that the expert relied on faulty information and employed faulty methodology in arriving at

his estimates. Many of the appellants' arguments are valid. However, even if the expert's testimony is disregarded entirely, Vento's own testimony provided legally and factually sufficient evidence to support the jury's finding on lost profits.

Vento testified that in early 1994, prior to purchasing the store, he and Taylor had an agreement whereby Vento received thirty percent of the store's net profits from sales at the end of each month. He further testified that after all store expenses were paid, his share of the monthly profits was approximately $1500 to $2000. In July 1994, Vento and Taylor became partners and Vento's share of the profits increased to fifty percent. He testified that his half of the profits for July 1994 was approximately $2400, but that July was "a slow month," and that, in general, business picked up during the fall months. If the profits were $4800 in a slow month, the jury could have concluded that the store made enough money during its "slow" periods to stay in business and enjoy greater profits when business improved. Moreover, Vento testified that his purchase of the store expanded the store's customer base by drawing business from his own well-established customers. Were it not for the $35,000—$40,000 depletion of inventory that took place during the period Vento was exiled from the store, he probably could have handled the unexpected financial burdens (*i.e.,* higher rent in December and unpaid electricity bills) he encountered when he returned, and remained in business for years to come. Appellants argue that the evidence was too speculative, contingent, and uncertain because of fluctuating market conditions in the sports memorabilia business. There was evidence that the sales of a sports memorabilia store tend to go up and down depending on what's happening in sports, particularly depending on whether local teams are doing well. Appellants also point to Bradford's testimony that sports memorabilia stores, although they may enjoy brief or seasonal success, do not do well in the long run. Obviously the jury was free to disbelieve Bradford's testimo-

ny. While the sports memorabilia business apparently went through periods that were less lucrative than others, we do not agree that the profitability of the business was so uncertain as to preclude recovery for lost profits.

Appellants argue that Vento would not have received a new lease from the mall, which would have prevented him from earning the lost profits awarded by the jury. There are two flaws in this argument. First, the jury could reasonably have concluded that were it not for Bradford and Taylor's misconduct, Vento would have been in financially sound condition and on good terms with the mall, and could have easily obtained a new lease. The second flaw is that even if Vento had been unable to obtain a new lease at Valle Vista mall, the jury could have reasonably determined that Vento would have moved his business to another mall of comparable size. Vento testified that a network exists among collectors and many sport collectors spend a great deal of time seeking out the merchandise they want. From this testimony, it would be reasonable for the jury to conclude that many of Vento's customers would follow him to a new location. Based on Vento's testimony, the jury could reasonably have found that the appellees would be fairly compensated by awarding him $100,000 for lost profits. We overrule appellants' seventh point of error.

## XI. Property Lost in Reliance

■ The jury awarded the appellees $14,000 in property lost in reliance on fraud. Vento testified that before he was ejected from the store by Taylor and Bradford, the value of the merchandise in the store was $45,000—$50,000. He testified that when the store was returned to him, the value of the merchandise remaining was $10,000. Vento also testified that $500 worth of merchandise disappeared when he was locked out by the mall for not paying his bills. Therefore, Vento's testimony would have supported an award of as high as $40,500 for lost property, and the

jury's award of $14,000 was supported by legally and factually sufficient evidence. We overrule appellants' tenth point of error.

## XII. Separate Liability of Simon and Golden for Punitive Damages

In response to question 14, which asks, "[w]hat sum of money, if any, should be assessed to the Plaintiffs against the Defendant as exemplary or punitive damages?" the jury answered as follows:

| | | |
|---|---|---|
| a. | Simon Property Group (Texas), L.P. | $1,000,000.00 |
| b. | Tom Taylor | $ 20,000.00 |
| c. | Bruce Bradford, individually and as manager of Valle Vista Mall | $2,500,000.00 |
| d. | Golden Ring Mall Company L.P. | $1,000,000.00 |

■ Although appellants note that they "do not challenge [Simon and Golden's] vicarious liability for Bradford's acts," they nonetheless complain that Simon and Golden cannot be separately liable for punitive damages because they did not separately commit any wrongful acts and "acted solely through Bradford."

In response, appellees point to Bradford's testimony that after Vento filed suit, the mall's "legal people" and "home office" were advised of developments and interactions with Vento. When Bradford was informed of Vento's request to show the property to Louis Martin, he discussed the matter with the mall's legal counsel. Because of this contact with Simon and Golden's lawyers, appellees argue, Simon and Golden are responsible for the mall's policy of initially refusing to permit Vento to show his merchandise to Louis Martin unless he first signed a document releasing the mall from liability.

We agree with appellants that Bradford's vague reference to dealing with Vento "through our legal people and our home office" is insufficient to merit the assessment of punitive damages against Simon and Golden on top of their liability for the punitive damages assessed against Bradford. Bradford's testimony concerning the consultation with the mall's lawyers is the only specific instance mentioned in the record concerning any direct involvement by counsel for the mall.

■ The underlying philosophy for imposing exemplary damages is to punish wrongdoers and to provide an example to other potential wrongdoers. *Borden, Inc. v. Guerra,* 860 S.W.2d 515, 527 (Tex. App.—Corpus Christi 1993, writ dism'd by agr.) Due process requires that exemplary damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id.* (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991)). Here, we find that the evidence of separate wrongdoing by the mall is insufficient to support the imposition of separate punitive damages against Simon and Golden.

■ Simon and Golden are undeniably responsible for Bradford's actions. Corporations "act only through agents of some character." *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 390 (Tex.1997) (citing *Fort Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397, 402 (1934), *overruled on other grounds by Wright v. Gifford–Hill & Co.,* 725 S.W.2d 712, 714 (Tex.1987)). Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) *the agent was employed in a managerial capacity and was acting in the scope of employment,* or (d) the employer or a manager of the employer ratified or approved the act. *Hammerly,* 958 S.W.2d at 391 (emphasis supplied) (citing RESTATEMENT OF TORTS § 909 (1939)); *see also Purvis v. Prattco, Inc.,* 595 S.W.2d 103, 104 (Tex.1980) (setting forth these same factors and citing section 909 of the RESTATEMENT (SECOND) OF TORTS, which is unchanged from the original RESTATEMENT OF TORTS). In *Fort Worth Elevators,* the Texas Supreme Court used the construct of "vice principal" to distinguish corporate acts from acts of employees. *Hammerly,*

958 S.W.2d at 391. As manager of the mall, Bradford is responsible for management of "a department or division" of the corporation's business, and accordingly, is a "vice principal." *See id.* ("vice principal" includes those to whom a master has confided the management of the whole or a department or division of his business).

We hold that Simon and Golden are jointly and severally liable for the $2,500,-000 in punitive damages assessed against Bradford, but that the $1,000,000 in punitive damages assessed against Simon and the $1,000,000 in punitive damages assessed against Golden must be deleted from the appellees' recovery.

### XIII. Joint and Several Liability for Exemplary Damages

■ Appellants further complain that no basis exists for imposing joint and several liability on appellants for the exemplary damages awarded against Taylor. In support, appellants cite former section 41.005 of the civil practice and remedies code, which provides:

In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant.[16]

Appellants' reliance on section 41.005 is misplaced because under the law applicable to the present action,[17] that section does not apply to intentional torts. *Transfer Prods., Inc. v. Texpar Energy, Inc.,* 788 S.W.2d 713, 717 (Tex.App.—Corpus Christi 1990, no writ).

■ Under the common law, however, where the defendants are closely related or the evidence establishes a link between the defendants or their wrongful actions, or where there are findings that the defen-

dants conspired to violate a plaintiff's rights, joint and several assessments of exemplary damages have been upheld. *Warner,* 888 S.W.2d at 599. In the present case, the evidence shows a link between the wrongful actions of Bradford and Taylor. On October 6, Bradford wrongfully used his authority to assist Taylor in ousting Vento from the store by telling the police that Taylor owned the store and by threatening Vento with criminal trespass charges. Bradford's statements to the police enabled Taylor to sell the store's merchandise, including Vento's personal collection. We hold that the appellants were properly made jointly and severally liable for the exemplary damages assessed against Taylor.

### XIV. Amount of Exemplary Damages

■ Appellants also complain that the exemplary damages assessed against them are excessive. Exemplary damages must be reasonably proportional to actual damages, although there can be no set ratio between actual and exemplary damages which will be considered reasonable. *Southwestern Ref. Co., Inc. v. Bernal,* 960 S.W.2d 293, 298 (Tex.App.—Corpus Christi 1997, pet. granted). Unless the award is so large as to indicate that it is a result of passion, or prejudice, or that the evidence has been disregarded, the verdict of the jury is conclusive and will not be set aside as excessive, either by the trial court or on appeal. *Berry Property Mgmt.,* 850 S.W.2d at 669.

■ In reviewing awards of exemplary damages, we consider the following factors: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which

---

**16.** This section, formerly § 41.005, was renumbered as § 41.006 by Acts 1995, 74th Leg., ch. 19, § 1, effective September 1, 1995. The text is unchanged.

**17.** Chapter 41 of the civil practice and remedies code was amended, effective September

1, 1995. A lawsuit, like the present action, filed on November 8, 1994, prior to the effective date of the 1995 amendments, is governed by the law applicable to the claim prior to the effective date of the amendments.

such conduct offends a public sense of justice. *Wright*, 725 S.W.2d at 714 (citing *Alamo Nat. Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981)).

■ The "nature of the wrong" and the "character of the conduct" favor imposition of exemplary damages. Bradford wrongfully threatened Vento with criminal trespass charges and told the police that the store belonged to Taylor, even though he knew Vento claimed ownership and had shown him a copy of the sales contract. Bradford wrongfully prevented Vento from doing business at his store by expelling him from the mall, and, thereby, facilitated Taylor's plundering of Vento's stock. The "degree of culpability of the wrongdoer" similarly supports imposition of exemplary damages. When the police attempted to deal with the dispute between Taylor and Vento, Bradford alone was in a position to assist in an informed, impartial manner. Instead, he deliberately chose to mischaracterize the state of affairs in a manner that proved devastating to Vento's business aspirations.

The "situation and sensibilities of the parties" also supports imposition of exemplary damages. Again, Bradford was in a position of authority, while Vento was a business novice, unable to protect his rights when challenged by Taylor. The final factor is "the extent to which such conduct offends a public sense of justice and propriety." This factor also weighs in favor of exemplary damages. At the moment the police turned to Bradford for guidance, Vento was completely dependent on Bradford to speak the whole truth (i.e., that Vento appeared to have a legitimate claim to ownership) and thereby protect Vento's interests. Instead, he made misleading statements to the police and furthered the damage to Vento by gratuitously threatening him with trespass charges if he returned, thereby making it harder for Vento to assert and protect his property rights. The jury's sense of justice and

propriety could reasonably have been offended by such conduct.

Appellants complain that the trial court's judgment for exemplary damages contains an error. Although the jury assessed exemplary damages against Taylor in the amount of *$20,000.00*, the judgment assessed exemplary damages against Taylor in the amount of *$2,000,000.00*. We agree with appellants' complaint, and reform the trial court's judgment consistent with the jury's findings.

■ After eliminating the recoveries that we have determined to be unsupported by legally sufficient evidence, the appellants and Taylor remain jointly and severally liable for $864,000 in actual damages.[18] After correcting the erroneous amount assessed against Taylor in the judgment, the exemplary damages stand at $2,520,000. This amount is slightly less than three times the amount of actual damages. After reviewing the evidence, we conclude that the amount assessed in exemplary damages bears a reasonable relationship to the actual damages awarded by the jury and was not excessive. *See Borden*, 860 S.W.2d at 528 (exemplary damages award five times the actual damages award not excessive); *Goswami v. Thetford*, 829 S.W.2d 317, 321 (Tex.App.—El Paso 1992, writ denied) (award of exemplary damages nineteen times the amount of actual damages not excessive). We overrule appellants' eighth point of error.

## XV. Conclusion

The judgment of the trial court is affirmed in part and reversed in part; we render judgment that the appellants are jointly and severally liable to the appellees for $864,000 in actual damages and $2,520,000 in exemplary damages.

Dissenting Opinion by Chief Justice ROBERT J. SEERDEN joined by Justice J. BONNER DORSEY.

---

**18.** This amount reflects $750,000 in mental anguish damages, $100,000 in lost profits, and $14,000 in property lost in reliance on fraud.

Dissenting Opinion by Chief Justice SEERDEN.

I respectfully dissent from the majority opinion to the extent that it upholds liability and damages against Bradford, Simon and Golden. I would hold that there was no evidence to support any of the findings of liability, including tortious interference with contractual relations, that the award of mental anguish damages is inappropriate in the present case and, even if appropriate, was excessive, and that there was no evidence to support the award for lost profits.

### No Evidence to Support Finding of Tortious Interference

The majority concedes that the only act by which Bradford, Simon and Golden could be held liable for tortiously interfering with Vento's contractual relations is Bradford's representation to the police that Taylor owned the store at the time of the confrontation between Taylor and Vento on October 6, 1994. This representation caused the police to eject Vento and restore Taylor to possession of the store. However, I would hold that Bradford's actions under the circumstances were not tortious, nor did they proximately cause Vento's injury.

Neither the police, nor Bradford, had the authority to determine right to possession as between Taylor and Vento. The police did, however, have the authority to keep the peace and to arrest anyone that they had probable cause to believe was trespassing on private property. To that end, they looked to Bradford as mall manager and landlord to tell them which of the two rival claimants owned the space in the mall leased to Collector's Choice.

Had Bradford disclosed that Vento came to him several days before and told him he had purchased the business and paid the rent on that space, but that Taylor still claimed ownership, we do not know what the police officers would have done. The evidence suggests that they were not looking to Bradford for background information, but, as the senior officer testified, for a judgment as to which of the two claimants owned the business.

Bradford was then faced with rival claimants and a written lease that still showed Taylor as the lessee. Whether or not Taylor had sold his business to a third party, the written lease between Taylor and the mall obligated the mall to protect Taylor's right to that lease until such time as Taylor relinquished it. It was, therefore, entirely reasonable for Bradford, as lessor, to continue to protect the right of this tenant to the peaceful possession of the leasehold until the right of Vento, as third-party purchaser, could be established. Nor is there any indication that a fuller explanation of the background facts by Bradford would have changed the result that day. It is entirely speculative what actions the police might have taken had they had the whole story concerning Bradford's knowledge of the relationship between Taylor and Vento. I would hold that there was no evidence to show that Bradford acted wrongfully or that his failure to relate the whole story to police proximately caused Vento to be removed from the mall and the resulting interference with Vento's contractual relations with his customers.

### Mental Anguish Damages Inappropriate

I would also hold that Vento is not entitled to damages for mental anguish flowing from his present claims for tortious interference against Bradford, Simon and Golden.

Mental anguish damages are not generally recoverable in a tort action based on rights growing out of the breach of a contract. *Rubalcaba v. Pacific/Atlantic Crop Exchange, Inc.,* 952 S.W.2d 552, 558 (Tex. App.—El Paso 1997, no writ); *Delgado v. Methodist Hosp.,* 936 S.W.2d 479, 486 (Tex.App.—Houston [14th Dist.] 1996, no writ); *Doe v. SmithKline Beecham Corp.,* 855 S.W.2d 248, 258 (Tex.App.—Austin 1993), *affirmed as modified,* 903 S.W.2d 347 (Tex.1995). The present action grows out of a breach of contract by which Vento

purchased a business from Taylor and the associated lease agreement under which that business was to operate in the Valle Vista Mall. Accordingly, I would deny recovery of mental anguish damages.

### No Evidence of Lost Profits

Finally, I would hold that the evidence was legally insufficient to support an award of lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994); *Texas Instruments v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex.1994). At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Szczepanik*, 883 S.W.2d at 649; *Holt Atherton Ind., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992).

Profits that are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. *Texas Instruments, Inc.*, 877 S.W.2d at 279. Moreover, in determining whether such an enterprise is unproven, the focus is on the experience of the persons involved in the enterprise and the nature of the business activity, and the relevant market. *Id.* at 280.

In the present case, Vento's expert, economist Dr. Gilbert De Los Santos, attempted to show lost profits by taking Vento's estimates of the monthly sales generated by Collector's Choice in 1994, then taking the amount of his 30% net profits for the first five months of that year, as reflected by the deposits shown in Vento's checkbook, and extrapolating a profit margin of 15.5%. He then used a 5% growth rate in sales over a ten-year period to project the profits lost over that period.

For two reasons, I do not agree that this was an adequate measure of profits.

First, Vento's estimates of the sales for 1994 were insufficient as a matter of law. Vento has not shown how he "estimated" the monthly sales of Collector's Choice, nor did Dr. De Los Santos know how these estimates were generated. Vento's testimony shows that he did not have personal knowledge of the exact amount, nor is there any indication how he arrived at these estimates. They are speculative at best and do not offer a reliable means of calculating profits.

Second, even assuming the accuracy of his calculations for 1994 under the ownership and management of Taylor, there was no indication what profits would have been under Vento's management and operation of the business.

The record shows this to be a small business dependent upon the direct labor and skill of the proprietor. The loss of that proprietor is, accordingly, a difficult variable to account for in determining the future profitability of the business without Taylor. This obstacle could, perhaps, be overcome with sufficient evidence of the manner of operation and how Vento planned to compensate for the loss of Taylor, together with evidence of Vento's own ability to manage a small business on his own.

However, the present record is devoid of any such evidence and depends almost entirely on evidence of past profitability under Taylor's management and control. This is not indicative of the profitability of the business as a sole proprietorship under Vento's management. We do not know whether Vento has the same abilities as Taylor to successfully operate a business on his own or to retain the customer base that Taylor built up over the years. Accordingly, the business under Vento's management is an unproven enterprise. *See Texas Instruments, Inc.*, 877 S.W.2d at 279–80. I would hold the evidence speculative and insufficient to support any certain measure of lost profits under Vento's sole management and control of the business.

I would reverse the trial court's judgment and render a take-nothing judgment in favor of Bradford, Simon and Golden.

Justice DORSEY joins in this dissent.