# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00114-CV

**Bobby J. Smith; Rock Systems Group, L.L.C.; and Lone Star Seating, L.L.C., Appellants[1]**

**v.**

**Royal Seating, Ltd., Appellee**

### FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT
### NO. 32,005, HONORABLE ED MAGRE, JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

Despite the fact that Royal Seating did not produce legally sufficient evidence to support two of the essential elements of a claim for tortious interference, the majority shows unwarranted and improper deference to the trial court and affirms the trial court's erroneous judgment. Because Royal Seating failed to show a reasonable probability that Royal Seating would have entered into a business relationship with the churches or that Rock Systems's conduct was independently tortious or wrongful, I must respectfully dissent.

### Factual Summary

In its summary of the evidence, the majority fails to note significant testimonial and documentary evidence showing gaps in Royal Seating's arguments. Although we are required

---

[1] When applicable, I will refer to the individual appellants by name and will refer to them collectively as "Rock Systems."

to show deference to the trial court as finder of fact in a bench trial, in considering the sufficiency of the evidence, we must also be mindful that in some cases, certain evidence may not be credited just as other evidence may not be disregarded by a reasonable fact-finder. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).

The parties called only three witnesses—Rick Creel, Royal Seating's second vice-president, Smith, owner of both Rock Systems and Lone Star Seating, and Gary Pemberton, former project manager for Royal Seating. Creel testified that Royal Seating does not contract directly with end users and instead enters into individual contracts with independent dealers, who work with the end users. Creel further testified that Royal Seating did not have a contract or exclusive arrangements with Rock Systems that would have required Rock Systems to buy chairs from Royal Seating. Although Creel said, "It was our intent to sell to those three churches" through Rock Systems as Royal Seating's dealer, he also testified that "[a]s far as I know," Rock Systems could have bought chairs from any distributor it wished. Gary Pemberton's testimony was similar. He said that Royal Seating did not have a written contract of any kind with Rock Systems and when asked, "Had Rock Systems Group decided that it could get a better deal from Irving or Irwin or some other manufacturer than it could from Royal Seating, could it have elected to buy those chairs from somebody else," Pemberton answered, "They could have, yes." Pemberton also stated that at the time he left Royal Seating on August 31, 2006, Royal Seating was not obligated to provide any chairs to any of the churches.

When Creel was asked for his recollection about how the potential sale to the California churches arose, he answered, "My recall, my recollection was that they—we were

2

contacted about three churches that they were working with in California, and they wanted—they were interested in Royal Seating's chairs . . . and that based on that interest, they wanted to do business with us—the churches wanted to do business with us. And we informed them that we did not sell direct. We are a dealer-based organization, and we informed them we do not sell direct and that we would have to have a dealer. And so at that point, basically, they said, well, the Royal Seating chairs and the warranty along with is what they were interested in. And then we looked at a dealer that would fit."[2] Creel testified that Jensine Bard, who he said "was a representative that had information on our product,"[3] "was working with Mr. Lazarian, who was the construction manager for the projects there in California that he'd been asked to serve. And so Jensine had been the one that talked with Steve Lazarian."[4]

In contrast to Creel's vague testimony about his "recall" and what "they" may have said, Smith testified that the first contact with any of the churches came from Ron Hester, one of Rock Systems's salesmen, who had moved to California and was attending church at ALC. Hester contacted ALC's pastor and soon learned that ALC's pastor was friends with Cottonwood's pastor and that both churches were planning projects requiring auditorium seating. Smith testified that

---

[2] Creel was not asked to clarify and the record does not reflect who Creel meant when he said "them" or that "they" wanted to do business with Royal Seating.

[3] Other than Creel's vague statement that Bard was "a representative" with information about Royal Seating's products, the record does not show what her relationship was with Royal Seating.

[4] The evidence is similarly vague as to what role Lazarian had in the church projects. Creel thought Lazarian was a "construction manager" for "some" of the churches; Smith testified that Lazarian was merely a consultant on two of the projects who lacked purchasing authority, although he gave himself the title of construction manager; and Pemberton testified that it was his "understanding" that Lazarian was a construction manager for "some" of the churches. The emails from Lazarian do not shed light on what his role and authority were.

3

ALC's pastor told Hester to talk to Steve Lazarian about the Cottonwood project and asked if "maybe you guys could cut us a deal if both churches bought chairs." An email from Smith to Royal Seating on December 1, 2005, supports Smith's testimony. In the email, marked "urgent," Smith asks Royal Seating for a quote for ALC, saying, "[M]y rep in California attends the church and knows the pastor. I believe Series or Irwin has already given them a quote." Gary Pemberton also supported Rock Systems's evidence about the origin of the relationship with the churches: he testified that Rock Systems asked Royal Seating for chair pricing for ALC, that Rock Systems's request for a quote was the first contact Royal Seating had with ALC, and that Smith also told Pemberton about the Cottonwood and EV Free projects. Pemberton testified that he promised Jensine Bard a finding fee "because she had put some initial work into Cottonwood." It was improper for the trial court to disregard undisputed, clear, positive, and direct testimony by Smith and Pemberton that was free from contradictions and inconsistencies and was supported by Smith's email written in late 2005, evidence that shows that the initial contact between the churches and the parties to this suit came through Rock Systems, in favor of Creel's vague and uncertain testimony about what he thought might have happened.

Further, although Creel said it was Royal Seating's "intent to sell to those three churches" through Rock Systems and despite an email from Pemberton to Bard stating that he believed that Rock Systems would soon be issuing purchase orders to Royal Seating and that the churches "fully intend on using our chairs," Royal Seating presented no evidence that the churches, in making their final purchasing decisions, did not legitimately change their mind and decide to buy from Lone Star Seating because Lone Star Seating was able to offer the same or a better bargain

4

for the churches' money.[5]  Smith said the church personnel had Royal Seating literature when he arrived for the May 2006 meeting, which he thought was probably provided by Bard.  Asked when he learned that Lazarian had been working with Bard to buy chairs, Smith answered, "Not to buy chairs, no.  They were going to buy from Irwin [one of Royal Seating's competitors].  It was a done deal.  That came out of Steve Lazarian's mouth:  Cottonwood was going to buy from Irwin, and that was the fact."  Smith testified that although Lazarian may at some point have said differently, the churches never told Smith that they wanted to buy "from" Royal Seating.  Royal Seating did not produce any communications from church decision-makers showing that the churches had made a final decision to buy chairs from Royal Seating through Rock Systems.  At most, Royal Seating showed that during the negotiations, Lazarian, whose authority was never defined or explained, indicated at one point that he planned to buy Royal Seating's chairs.

**Discussion**

In its analysis, the majority completely overlooks the absence of evidence supporting at least two essential elements of Royal Seating's claim against Rock Systems.  Royal Seating did not present evidence to show that there was a reasonable probability that it would have entered into a business relationship with the churches or that Rock Systems's conduct was independently tortious or wrongful.  *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2000) (plaintiff must prove defendant's "conduct would be actionable under a recognized tort"); *Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).  Without such

---

[5] Nor did Royal Seating present evidence that it had dealt with persons who were actually authorized to speak on behalf of the churches.

5

evidence, even if Rock Systems's conduct was "'sharp' or unfair," Royal Seating may not prevail on its claim. *Sturges*, 52 S.W.3d at 726.

Although the law related to tortious interference usually applies in a contractual context, I recognize that such a claim may be raised in the case of "interference with a continuing business or other customary relationship not amounting to a formal contract" and in relation to "prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation." Restatement (Second) of Torts § 766B cmt. c (1979). However, it is not improper to cause a third-party not to enter into a business relationship with the plaintiff if the relationship "concerns a matter involved in the competition between" defendant and plaintiff, the defendant does not act wrongfully, the defendant's conduct "does not create or continue an unlawful restraint of trade," and the defendant's "purpose is at least in part to advance his interest in competing" with the plaintiff. *Id.* § 768(1) (1979). Further, my research did not uncover any Texas cases in which a plaintiff who would not have had some kind of direct contractual or pseudo-contractual relationship with the third-party,[6] and in *Sturges*, the

---

[6] All of the illustrations set out in the relevant sections of the Restatement (Second) of Torts involve direct relationships between plaintiffs and third-parties with which defendants interfere. *See, e.g.*, Restatement (Second) of Torts §§ 766, 766C, 767, 768, 769 (1979). The relevant sections also refer to contracts or describe the relationships as "contractual," thus supporting my conclusion that the plaintiff must have sought a direct relationship with the third-party that was wrongfully thwarted by the defendant. *See, e.g.*, *id.* §§ 766 (Intentional Interference with Performance of *Contract* by Third Person), 766A (Intentional Interference with Another's Performance of His Own *Contract*), 766B (Intentional Interference with Prospective *Contractual* Relation), 766C (Negligent Interference with Contract or Prospective *Contractual* Relation) (1979) (emphasis added).

6

supreme court said, "There are only a few Texas cases in which the plaintiff has recovered [for tortious interference with a prospective business relationship]." 52 S.W.3d at 725.[7]

A customer is entitled to solicit bids and conduct in-depth negotiations right up until the moment it enters into a contract. Involvement in negotiations and giving signs of planning to buy from one company does not bar a customer from changing its mind at the last minute. The fact that there are ties between Rock Systems and Lone Star Seating does not change the fact that, if any of Royal Seating's competitors, including Lone Star Seating, could give the churches the same or

---

[7] The Texas cases to which the supreme court cites are *Bradford v. Vento*, 997 S.W.2d 713 (Tex. App.—Corpus Christi 1999), *rev'd in part*, 48 S.W.3d 749 (Tex. 2001), in which a purported buyer of a store sued the seller and mall for interfering with his plans to sell the store to the third-party; *Edwards Transports, Inc. v. Circle S Transports, Inc.*, 856 S.W.2d 783 (Tex. App.—Amarillo 1993, no writ), involving a suit between two transportation companies, both of which had pre-existing relationships and had done business directly with the third-party, although neither had a formal contract with the third-party; *State National Bank v. Farah Manufacturing Co.*, 678 S.W.2d 661 (Tex. App.—El Paso 1984, writ dism'd by agr.), in which the business alleged that a bank that held one of the business's loans interfered with the business's choice of leadership; *Light v. Transport Insurance Co.*, 469 S.W.2d 433 (Tex. Civ. App.—Tyler 1971, writ ref'd n.r.e.), involving a dispute between an agent and an insurer who took a customer away from the agent by writing insurance in violation of state law; *Griffin v. Palatine Insurance Co.*, 235 S.W. 202 (Tex. Comm'n App. 1921, judgm't adopted), in which several insurers refused to sell insurance to a business that refused a settlement after a fire, resulting in the business being unable to obtain any insurance; *Celli & Del Papa v. Galveston Brewing Co.*, 227 S.W. 941 (Tex. Comm'n App. 1921, judgm't adopted), in which the defendant brewing company threatened its tenant saloons to make the saloons stop buying beer and other products from the plaintiff liquor distributor; *American Freehold Land Mortgage Co. v. Brown*, 118 S.W. 1106 (Tex. Civ. App. 1909, writ ref'd), in which the defendant mortgage company allegedly told the plaintiff's customers that the plaintiff, a lending agent, was neglectful, irresponsible, and insolvent; *Robison v. Texas Pine Land Association*, 40 S.W. 843 (Tex. Civ. App. 1897, no writ), in which the defendant company was accused of threatening to fire any employee that used vouchers issued by the company to buy goods from the plaintiff's store; and *International & G.N. Railway v. Greenwood*, 21 S.W. 559 (Tex. Civ. App. 1893, no writ), in which the railroad was accused of encouraging its employees to boycott the plaintiff's boarding house. Every one of those cases involves a plaintiff who had or stood to have a direct business relationship with the third-party.

a better deal, there is no reason that Rock Systems could not change its intentions and buy chairs from the competitor instead of Royal Seating. Royal Seating asserts that it presented evidence "that it had business relations with the three churches which were to culminate in profitable contracts," but concedes that it never would have entered into a contractual relationship with the churches. Although Royal Systems produced various emails from Pemberton, Jensine Bard, Smith, and Lazarian documenting the parties' negotiations and bidding for contracts to provide the churches with auditorium seating, Royal Seating's arrangement with Rock Systems was not exclusive, and both Pemberton and Creel testified that Rock Systems was not bound to accept Royal Seating's bids to provide chairs for its end users.[8]

Royal Seating did not produce any evidence that Rock Systems was obligated to choose Royal Seating's bid in satisfying an end user's request and showed only that it was bidding for the churches' business. Rock Systems contracted with the churches for a particular chair at a particular price,[9] and the evidence presented by Royal Seating shows that Rock Systems was legally entitled to contract with any of its distributors to satisfy the churches' needs. Although Royal Seating might have *hoped* Rock Systems would choose Royal Seating's chairs and the

---

[8] I recognize that Royal Seating provided a March 2007 email from Lazarian stating that the churches wanted to buy their chairs from Royal Seating, but as I have said, Lazarian's role in the projects is unclear, and despite that email, the final purchase orders signed by church representatives indicated that the chairs would be provided by Lone Star Seating, not Royal Seating. Royal Seating did not present any evidence showing that the churches were misled into believing their chairs were from Royal Seating instead of Lone Star Seating.

[9] The parties did not present evidence about what involvement, if any, the end user has in the decision-making process or whether the end user discusses bids and products with Rock Systems, with the two making a joint decision as to what distributor will be used.

churches may have given indications that they planned to do so, Royal Seating certainly did not prove that it had a right to assume that it would benefit from Rock Systems's contracts with the churches.[10]

Further, although Royal Seating claims Rock Systems committed fraud or conversion, there is no evidence to show that Rock Systems committed either tort and thus no evidence that Rock Systems's conduct was independently tortious or wrongful.[11]

Fraud is an action, omission, or concealment in breach of a legal duty or trust that injures another or gives the wrongdoer an unfair advantage. *Jones v. Texas Dep't of Protective & Regulatory Servs.*, 85 S.W.3d 483, 491 (Tex. App.—Austin 2002, pet. denied) (quoting *Vela v. Marywood*, 17 S.W.3d 750, 760-61 (Tex. App.—Austin 2000), *pet. denied*, 53 S.W.3d 684 (Tex. 2001)). "[A] party to a contract is free to pursue its own interests, even if it results in a breach of that contract, without incurring tort liability," and "[t]he fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992).

Royal Seating contends that Rock Systems committed fraud by not disclosing that they planned to buy the churches' seating from Lone Star Seating instead of Royal Seating or

---

[10] Under its non-exclusive arrangements with its dealers, Royal Seating might at most be an incidental third-party beneficiary to its dealers' contracts with end users. However, a third-party beneficiary only has rights under a contract if it is an *intended* beneficiary. *See* Restatement (Second) of Contracts §§ 302, 304 (1981). "An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." *Id.* § 315 (1981).

[11] I must note that in its findings of fact and conclusions of law, the trial court simply "found" without any explanation that Rock Systems's conduct "was independently tortious and unlawful." This, however, is not a finding of fact but instead is a conclusion of law, and the court made no findings related to what specific conduct was unlawful or tortious.

that they were in negotiations with Mobiliario to become a distributor. However, Royal Seating has not shown that Rock Systems had any legal duty to disclose its plans—there was no contract or exclusive arrangement between Royal Seating and Rock Systems, and Pemberton testified that Rock Systems could have bought chairs from any of Royal Seating's competitors. Absent a contractual provision or fiduciary duty,[12] neither of which is present here, Rock Systems was not obligated to tell Royal Seating that it planned to establish Lone Star Seating as a competing distribution company or that it planned to order chairs from Lone Star Seating.

Further, the only evidence related to the churches' wishes came through emails between Lazarian and representatives of Rock Systems and Royal Seating. At most Royal Seating proved that at one stage in the negotiations, Lazarian, someone with unknown authority for decision-making on behalf of the churches, stated that he wanted to buy from Royal Seating. Royal Systems provided no direct evidence from the churches, such as testimony by or affidavits from church decision-makers showing that, in making their final decision, the churches told Rock Systems to order from Royal Seating or were somehow misled into believing the chairs were coming from Royal Seating instead of Lone Star Seating. In other words, there is no evidence that the churches

---

[12] "[F]iduciary duties may arise in the context of informal moral, social, domestic, or personal relationships in which one person trusts and relies on another. However, a fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not, alone, indicate that he placed confidence in another in the sense demanded by a fiduciary relationship, because something apart from the transaction between the parties is required." *Stephanz v. Laird*, 846 S.W.2d 895, 901-02 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (citation omitted); *see Grinnell v. Munson*, 137 S.W.3d 706, 718 (Tex. App.—San Antonio 2004, no pet.) (fiduciary relationship is "extraordinary" and not recognized lightly). Although Royal Seating alleged that Rock Systems breached fiduciary duties, the trial court's so-called findings and conclusions speak only to tortious interference.

10

were not persuaded through legitimate business practices to switch from Royal Seating to Lone Star—the offering of a better price or other non-wrongful competitive conduct cannot support a tortious interference claim. Indeed, the fact that the final purchase orders refer to Lone Star Seating would support an inference that the churches knew exactly who would be supplying their chairs.

As for Royal Seating's argument that Rock Systems committed conversion when it cashed a deposit check from Cottonwood without disclosing it to Royal Seating, the evidence does not establish that Royal Seating had any ownership or possession rights to the check. *See Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.—Austin 1997, writ denied) (to establish conversion, plaintiff must prove it had legal possession of or entitlement to possession of property, defendant unlawfully and without authorization took control over property to exclusion of or inconsistent with plaintiff's ownership rights, plaintiff demanded property's return, and defendant refused). Without such evidence, Royal Seating cannot show conversion. *See id.*

The disputed check is from Cottonwood and is made out to "ROCK SYSTEMS GROUP/ROYAL SEATING LTD" in the amount of $105,487.50. The check references "ID#: 61132" and was dated July 12, 2006. That purchase order was not introduced into evidence, and it is not clear whether it was prepared by Rock Systems or Cottonwood. The parties also introduced (1) purchase order number 6106 written on Cottonwood's letterhead on May 31, 2006, addressed to "ROCK SYSTEMS GROUP/ROYAL SEATING LTD.," and stating that the church was ordering 3,600 Alessandria chairs for a total of $461,601.00, that a deposit of "25% of total price" was required, that the order and deposit were "subject to acknowledgment by Royal Seating," and that the order was subject to a more definitive agreement; (2) an email from Rock Systems to

11

Royal Seating dated June 29, 2006 stating, "This is a preliminary purchase order for your file, I have not received the deposit or fabric selection yet," and asking Royal Seating to fax a letter "stating that Royal Seating has received the PO asap"; and (3) a fax from Royal Seating to Rock Systems dated June 29, 2006, acknowledging receipt of Rock Systems's "Purchase Order *RSG PO# 206-03CA for the Cottonwood Christian Center" for 3,600 Alessandria chairs. Creel testified that Royal Seating's fax was sent in response to Rock System's email.

The parties did not introduce into evidence purchase order 206-03CA, referenced in the email and fax, and the check, written about two weeks later and not written for 25% of the total price of Cottonwood's purchase order 6106.[13] The trial court seems to have ignored the fact that the evidence does not show that a Cottonwood representative ever saw Royal Seating's fax, much less that the check was related or written in response to the fax. More important, Cottonwood's mistaken use of Royal Seating's name on the check does not give Royal Seating a right to possession of the money.[14] I cannot imagine that the majority intends to hold that, if a payor mistakenly writes an additional name as a payee on a check, that named party is instantly and legally entitled to the proceeds of the check, regardless of the contractual arrangements surrounding the writing of the

---

[13] Twenty-five percent of $461,601.00 is $115,400.25, not $105,487.50.

[14] Royal Seating introduced several purchase orders prepared by Rock Systems for the churches throughout the negotiations. Some of them are written on letterhead that reads, "Rock Systems Group/Royal Seating Ltd." Others are written on letterhead in Rock Systems's name alone, and still others on letterhead for Rock Systems/Lone Star Seating. Smith testified that he created the letterhead including the one for "Rock Systems Group/Royal Seating Ltd.," and there was no evidence that Royal Seating endorsed or even knew about the letterhead. All of the purchase orders prepared by Rock Systems, whether on letterhead for Rock Systems, Rock Systems/Royal Seating, or Rock Systems/Lone Star Seating, state that deposit checks should be made payable to Rock Systems Group, not to Rock Systems and some other entity.

check.  Instead, the majority should recognize that the contract under which the check was apparently written was between Cottonwood and Rock Systems alone, and that Royal Seating had no right to any of the deposit money until Rock Systems sent a final purchase order to Royal Seating.  Because Royal Seating did not show any right to possession of the Cottonwood funds, there is no evidence to show that Rock Seating committed conversion with relation to the check.  *See id.*

## Conclusion

I believe the trial court clearly erred in its review and weighing of the evidence. Royal Seating utterly failed to present legally sufficient evidence to show at least two elements of its tortious interference claim, and therefore is not entitled to recover.  The majority has glossed over the evidentiary gaps in its determination to affirm the trial court.  I would reverse the portion of the trial court's judgment finding in favor of Royal Seating on its tortious interference claim and would remand the cause for a new determination of attorney's fees.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Patterson and Puryear

Filed:  November 6, 2009

13